HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PHILLIP ARNOLD,

                  Plaintiff,

      v.

CITY OF LAKEWOOD, a municipality; and
ANDY HALL, in his personal and official
capacities,

                  Defendants.

No. 3:10-cv-05907 RBL

ORDER

[Dkt. #33]

## I.      INTRODUCTION

On September 26, 2008, Plaintiff Phillip Arnold commenced a drug and alcohol-fueled chase with Lakewood police, during which Officer Andrew Hall shot Mr. Arnold.  In this suit, Mr. Arnold claims that Officer Hall used excessive force in violation of the Fourth Amendment and that Officer Hall is liable in tort for assault and battery and intentional infliction of emotional distress.  Officer Hall requests summary judgment on all claims.  *See* Def.'s Mot. Summ. J. [Dkt. #33] *and* Reply [Dkt. #49]; Pl.'s Resp. [Dkt. #46].  In light of the facts and relevant case law, the Court **GRANTS** Officer Hall's motion for summary judgment.

## II.      FACTUAL BACKGROUND

On September 25, 2008, Plaintiff Phillip Arnold and an associate, Anthony Tellez, began their evening with a visit to a liquor store and two bars, consuming 5–10 drinks and smoking

marijuana.[1]  *See* Decl. of Steve Parr, Ex. 30 at 44–47 [Dkt. # 34].   Upon leaving the second bar in a Chevy Blazer belonging to Mr. Arnold's girlfriend, Mr. Arnold displayed dramatically erratic driving: he started doing "burn outs," driving in circles and over curbs, running red lights. *Id.* at 49.  Following a report from a Lakewood resident that a car had driven through their yard, Officer Hall spotted a matching vehicle—the Blazer driven by Mr. Arnold (with Mr. Tellez as passenger).  Decl. of Andy Hall at 2 [Dkt. #35].   At 1:41 a.m., Officer Hall activated his lights behind Mr. Arnold, signaling him to stop.  *Id.* at 6.  Mr. Arnold pulled to a red light, but then continued driving.  *Id.*  He eventually pulled into the Schooner Tavern parking lot, where he revved his engine and spun his tires before finally bringing his vehicle to a stop.  *Id.*

Officer Hall then approached the vehicle and commanded a visibly-intoxicated Mr. Arnold to turn off the engine—three times.  *Id.* at 7. Mr. Arnold did not respond.  *Id.* Officer Hall attempted to unlock the driver-side door by reaching through the half-open window; Mr. Arnold put the car in gear and accelerated, beginning the chase.  *Id.*

During the pursuit, Mr. Arnold sped over curbs, sidewalks, and grass medians—colliding with two police cars in the process.  *Id.*; *see also* Decl. of Dacia Uecker at 2 [Dkt. # 36].  His passenger, Mr. Tellez, later stated that he "would have jumped out if [he] could have," and that Mr. Arnold "tried everything he could to get away."  Parr Decl. at 51.  The chase came to a momentary halt when Mr. Arnold rammed a large wooden fence and its surrounding shrubbery, which "high-centered" the vehicle.  Hall Decl. at 8.

Three Lakewood police officers—Hall, Borchardt, and Babcock—then surrounded the Blazer, weapons drawn.  *Id.*; *see also* Decl. of Timothy Borchardt at 19 [Dkt. #41].  Officer Hall approached the passenger-side; Officer Babcock the rear; and Officer Borchardt the driver-side, each repeatedly ordering Mr. Arnold to turn off and exit the vehicle.  *Id.*  Mr. Arnold refused.  *Id.*

Officer Hall opened the passenger-side door and pulled Mr. Tellez from the vehicle as Officer Babcock smashed the tinted rear-window of the Blazer.  Hall Decl. at 3; Borchardt Decl. at 21.  Officer Babcock then moved to subdue a struggling Mr. Tellez, pulling the latter to the

---

[1] Mr. Arnold expressly accepts the facts as set out by Officer Hall, choosing not to "reiterate the facts set forth in [Officer Hall's] brief."  Pl.'s Resp. at 2 [Dkt. #46].  Thus, the Court must rely on Officer Hall's briefing for the factual background.  The Court must, of course, consider the facts in the light most favorable to Mr. Arnold and has identified and listed those facts Mr. Arnold argues create a genuine issue of material fact.

ground and, in the process, falling behind the vehicle.  Hall Decl. at 3.  With the two men behind the vehicle, and debris blocking Officer Borchardt from opening the driver-side door, Mr. Arnold began rocking the car back and forth, shifting from forward to reverse, attempting to gain traction.  *Id.* at 3; Borchardt Decl. at 21.  Officer Borchardt stated that he "could hear the suspect grinding gears" as Mr. Arnold rocked the vehicle, "gunning" the engine and sending dirt flying. *Id.* at 19–22.  Further, as the Blazer rocked backwards, it moved directly at Officer Babcock, threatening to either run him over or crush him against a police cruiser parked behind.  *Id.*

Officer Hall states: "I was aware that Officer Babcock was on the ground behind the SUV struggling to gain control of the combative passenger . . . ."  Hall Decl. at 3.  Further, "[a]s the SUV rocked back and forth, it was my perception that the driver did not care which direction he travelled . . . [h]e might accelerate in reverse and attempt to crash backwards into the patrol vehicle behind him."  *Id.*  Officer Hall "believed that [Mr. Arnold] was going to run over Officer Babcock," who would be "seriously injured or killed if hit . . . ."  *Id.*  Officer Borchardt agreed that "if [the Blazer] would of got [sic] traction it would have shot back and . . . ran right over Officer Babcock."  Borchardt Decl. at 24.  Apart from the risk to Officer Babcock, Officer Hall noted the danger to himself: he "would [have been] pinned in the door jamb and possibly seriously hurt."  Hall Decl. at 8.

The events are confirmed by an independent witness.  Ms. Dacia Uecker was on a civilian ride-along in Officer Hall's cruiser.  She states that "[Mr. Arnold] began to rock the vehicle back and forth," and "Officer Babcock was behind the vehicle and would have been struck if the SUV broke free in reverse."  Uecker Decl. at 3; *see also* Decl. of Jeffrey H. Sadler, Ex. A at 15 (Post-Incident Interview Transcript of Dacia Uecker) [Dkt. # 47] (A: "Officer Babcock was behind the vehicle." Q: "Had the car gotten traction and gone into reverse could have hit him [sic]." A: "He would, he would have hit him.").

In the melee, as the Blazer gained traction, Officer Hall fired three shots, striking Mr. Arnold in the face and shoulder.  Hall Decl. at 8.  Yet, Mr. Arnold succeeded: the Blazer gained traction and accelerated forward over the fence and shrubbery.  *Id.*

Mr. Arnold thus resumed his escape.  Lakewood police then performed not one, but two "PIT maneuvers," (pursuit intervention technique) whereby an officer steers the front of a cruiser into a suspect's rear quarter panel, ideally causing the recipient to spin to a stop.  Decl. of James Syler at 5 [Dkt. #40].  After the second PIT, Mr. Arnold rammed Officer Syler's vehicle, a move that ultimately pinned the Blazer.

Despite receiving three gunshot wounds, colliding with three police cars, and receiving two PIT maneuvers, Mr. Arnold *still* refused to exit the Blazer.  *Id.*  Officers, seeing that Mr. Arnold was holding "something black in his hand," used a "less-lethal" shotgun to shoot out the Blazer's passenger-side window.  *Id.* at 6.  This allowed officers to see that Mr. Arnold held only a mobile phone, and officers were then able to physically remove Mr. Arnold from the Blazer. *Id.*

Mr. Arnold was convicted of Felony Harassment, Attempting to Elude a Police Vehicle, and three counts of Malicious Mischief.  Decl. of Stewart Estes, Ex. B at 14 [Dkt. #42].  He was sentenced to 33 months in prison.  *Id.*

Mr. Arnold's key factual argument is simple: Officer Babcock was not, in fact, behind the Blazer, and therefore, not in danger.  Rather, Mr. Arnold asserts that Babcock was "on the driver's side of the car near the rear."  *See* Pl.'s Resp. at 4.  The sole basis for this assertion is Officer Borchardt's statement, in a post-incident interview, that Babcock was "on the corner" when Officer Hall fired.  Borchardt Decl. at 19.  But, Officer Borchardt clarifies multiple times that Babcock was behind the vehicle when last seen.[2]

---

[2] In the post-incident interview, at 5:40 a.m. on September 26, 2008, Sergeant Andy Estes questions Officer Borchardt:

    Q: "When you last saw him he was behind the car?"
    A: Absolutely, yeah.
    . . .
    Q: "So Officer Babcock to the best of your knowledge is somewhere behind you and possibly directly behind the car?"
    A: "Correct."
    Q: "Ok. Um, what would happen had [the Blazer] gone into reverse? If it had gotten traction going in reverse instead of forward?"
    A: "The way the engine was revving, um if it would of got traction it would have shot back and probably, most likely ran right over Officer Babcock if he was still standing in the same position when I saw him last."
Borchardt Decl. at 19–21.

Second, Mr. Arnold emphasizes that the vehicle was moving *forward* at the instant Officer Hall fired.  Pl.'s Resp. at 4.  This is consistent with all reports of the incident.

Third, Mr. Arnold stresses that he was not intentionally trying to harm anyone.  Indeed, Ms. Uecker stated in her post-incident interview that Mr. Arnold "might have been intoxicated trying run and trying evade it didn't, didn't look like he was actually trying to was trying to be out to hurt somebody [sic]."  Sadler Decl., Ex. A at 16.

Lastly, Mr. Arnold relies on the unsigned affidavit of Mr. D.P. Van Blaricom, a retired Bellevue police chief and frequent participant in excessive-force cases.  *See* Pl.'s Resp. at 6; Van Blaricom Aff. [Dkt. # 48].  Mr. Van Blaricom's improperly-submitted affidavit purports to opine that "plaintiff did not pose a significant threat of death or serious physical injury to either the shooter or others at the time that he was shot."  *Id.*

## III.    DISCUSSION

Officer Hall argues that he did not violate Mr. Arnold's Fourth Amendment rights and that he is entitled to qualified immunity.  As an initial matter, it is not clear to the Court that Mr. Arnold's Second Amended Complaint asserts a § 1983 claim against Officer Hall.  Rather, that claim appears to be asserted against the City of Lakewood, now dismissed from this case.  Mr. Arnold's briefing, however, makes it clear that he believes he has asserted a § 1983 claim against Officer Hall.  In the interest of judicial efficiency, and because the Court concludes that Officer Hall did not violate Mr. Arnold's rights  and is entitled to qualified immunity, the Court will treat the Complaint as if it properly sets out a § 1983 claim against Officer Hall.  Further, the Court concludes that Mr. Arnold's claims for assault and battery and for intentional infliction of emotional distress similarly fail as a matter of law.

### A.  Summary Judgment Standard

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law.  Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy*, 68 F.3d at 1220.

### B. Qualified Immunity

Qualified immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The purpose of the doctrine is to "protect officers from the sometimes 'hazy border' between excessive and acceptable force." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)). Qualified immunity protects officers not just from liability, but from suit: "it is effectively lost if a case is erroneously permitted to go to trial," and thus, the claim should be resolved "at the earliest possible stage in litigation." *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987). The Supreme Court has endorsed a two-part test to resolve claims of qualified immunity: a court must decided (1) whether the facts that a plaintiff has alleged "make out a violation of a constitutional right," and (2) whether the "right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 553 U.S. 223, 232 (2009).[3] The Court addresses each question in turn.

### 1. Did Defendant Violate Plaintiff's Fourth Amendment Rights?

Mr. Arnold claims that Officer Hall violated his Fourth Amendment right against unlawful seizure by using excessive force. *See* Pl.'s Second Am. Compl. at 6 [Dkt. # 20]. "Apprehension by deadly force is a seizure subject to the Fourth Amendment's reasonableness requirement." *Wilkinson v. Torres*, 610 F.3d 546, 550 (2010) (citing *Graham v. Conner*, 490 U.S. 386, 395 (1989)). The reasonableness of force is determined by "carefully balancing the

---

[3] In *Pearson*, the Supreme Court reversed its previous mandate from *Saucier* requiring district courts to decide each question in order. Although not mandated here, the Court will address both issues.

nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001) (citing *Graham*, 490 U.S. at 396). Courts assess the "quantum of force used to arrest" by considering "the type and amount of force inflicted." *Id.* at 1279–80. A court assesses the governmental interests by considering a range of factors, including "the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, whether he was actively resisting arrest or attempting to evade arrest by flight," or any other "exigent circumstances." *Id.* Where an officer has "*probable cause to believe* that the suspect poses a threat of serious physical harm, either to the officer or to others," the officer may constitutionally use deadly force. *Wilkinson*, 610 F.3d at 550 (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)) (emphasis added).

Importantly, a court must judge reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Courts are cautioned to make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* And, although the question is "highly fact-specific," the inquiry is objective: a court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 383 (2007); *Graham*, 490 U.S. at 397). Given the undisputed facts of this case, and in light of analogous case law, the Court must conclude that Officer Hall did not violate Mr. Arnold's Fourth Amendment rights. No reasonable jury could conclude otherwise.

> **a. The Facts and Case Law Show that Officer Hall's Use of Force Was Reasonable.**

Here, the governmental interests at stake are the lives of officers Hall, Babcock, and Borchardt. Officer Hall has presented unrebutted evidence that Mr. Arnold posed an immediate threat of serious physical harm to all the officers—Hall and Babcock in particular. Each and every witness paints a deadly picture: Officer Babcock was behind the Blazer as Mr. Arnold rocked the vehicle back and forth, ignoring commands from the officers and attempting to escape at any cost. At the same time, Officer Hall stood near enough to the open passenger-side door

that, if the Blazer reversed, he might be pinned.  Mr. Arnold's actions placed both Officers Hall and Babcock at immediate risk of serious bodily injury or death and forced Officer Hall to make a split-second decision to fire as he watched the Blazer's tires begin to grip.

Against those governmental interests, the Court balances the most extreme use of force: firing a gun at a suspect.  There is no greater quantum of force that an officer may employ.  Thus, the "nature and quality" of Officer Hall's intrusion on Mr. Arnold's Fourth Amendment rights could not be greater.  Yet, such an intrusion is reasonable under these circumstances.  Mr. Arnold, by engaging in a dangerous pursuit with police, by ignoring numerous commands to exit the Blazer, and by placing officers Babcock and Hall at risk of serious injury, forced Officer Hall to use deadly force.  Officer Hall was left with no other option.

The Court's conclusion is buttressed by Ninth Circuit case law.  Under strikingly similar circumstances, the Ninth Circuit found no constitutional violation in *Wilkinson v. Torres*, 610 F.3d 546 (9th Cir. 2010), where officers surrounding a fleeing vehicle shot and killed the driver, whose estate later claimed excessive force.  *Id.* at 546.  In that case, the driver initiated a relatively low-speed chase in a stolen minivan.  *Id.* at 549.  Officers performed two PIT-maneuvers on the minivan, the second leaving the suspect in a residential yard.  *Id.*  As the suspect regained control, an officer positioned his cruiser in front of the minivan, which swerved and hit a telephone pole.  *Id.*  Two officers then approached the minivan on foot and ordered the driver to exit.  *Id.*  One officer attempted to open the driver-side door, but fell as the minivan began to reverse, with its wheels spinning in mud.  *Id.*  While the first officer recovered his footing and dodged the minivan, the second officer on the passenger-side believed that the first had been run over and began shooting, firing eleven rounds in all.  *Id.*

The Ninth Circuit held that the officer "had probable cause to believe that [the driver] posed an immediate threat to the [first officer] and himself."  *Id.* at 551.  In so holding, the court relied on the fact that the officer stood in a "slippery yard with a minivan accelerating around him," that the driver "had failed to yield to police sirens," and that "a fellow officer was nearby either lying fallen on the ground or standing but disoriented."  *Id.*  Thus, where "the driver of a moving vehicle . . . [is] ignoring police commands, attempt[ing] to accelerate within close

quarters of two officers on foot," the officer had probable cause to believe "that the threat to safety justified the use of deadly force." *Id.*

The similarities between this case and *Wilkinson* are readily apparent and dictate the same outcome.  Officer Hall fired on Mr. Arnold because he reasonably believed another officer to be threatened by the accelerating Blazer.

### b.   Plaintiff Fails to Show a Genuine Issue of Material Fact.

The Court must reject Mr. Arnold's attempts to generate a factual issue.  Even viewing all the facts in Mr. Arnold's favor, Officer Borchardt's statement that Officer Babcock was "on the corner" of the Blazer is not, as Mr. Arnold suggests, a "definite[] state[ment]" that Officer Babcock was out of harm's way.  Pl.'s Resp. at 4.  To the contrary, Officer Borchardt repeatedly stated that he saw Babcock behind the Blazer and was at risk of being struck.  Borchardt Decl. at 21, 22, 24.  Further, the phrase "on the corner" does not imply, as Mr. Arnold suggests, that Officer Babcock was not also behind the vehicle.

Mr. Arnold's argument that he did not *intend* to harm the officers is irrelevant.  *See* Pl.'s Resp. at 4.  The question is not one of intent.  As noted above, Officer Hall reasonably believed Mr. Arnold to be a threat, regardless of Mr. Arnold's desire (or lack thereof) to actually threaten.

Mr. Arnold also fails to create a factual issue by noting that the Blazer was moving forward at the instant Hall fired.  Pl.'s Resp. at 4.  Faced with the uncertainty that Mr. Arnold might again reverse the Blazer, Officer Hall reasonably concluded that Officer Babcock was threatened—no reasonable fact-finder could determine that Officer Hall lacked probable cause for that belief.

Lastly, the Court must disregard Mr. Van Blaricom's affidavit because it is unsigned.  *See* Fed. R. Civ. P. 56(e); *Canada v. Blain's Helicopters Inc.*, 831 F.2d 920, 925 (9th Cir. 1987) ("It is well settled that unauthenticated documents cannot be considered on a motion for summary judgment.").  Indeed, Mr. Arnold has failed to correct the problem despite notice from the Defense.  *See* Def.'s Reply at 2 [Dkt. # 49].  Even if the affidavit were signed, the Court would properly disregard its contents.  Mr. Van Blaricom's opinion—that "Plaintiff did not pose a significant threat of death or serious physical injury"—is a legal conclusion that would be case-

dispositive. *U.S. v. Scholl*, 166 F.3d 964, 973 (9th Cir. 1999) (excluding expert witness testimony concerning the reasonableness of defendant's belief as a legal conclusion); *see also Aguilar v. Int'l Longshoremen's Union*, 966 F.2d 443, 447 (9th Cir. 1992) (noting matters of law are for the court's determination, not that of an expert witness); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 509–10 (2d Cir. 1977) (expert testimony consisting of legal conclusions is inadmissible). Thus, the Court must disregard Mr. Van Blaricom's conclusion. The remaining portions of Mr. Van Blaricom's affidavit do not pertain to Officer Hall or are irrelevant here.

In sum, the Court must conclude that Officer Hall had probable cause to believe that Mr. Arnold presented an immediate risk of serious bodily injury of death to himself and Officer Babcock. Thus, his use of deadly force was reasonable under the circumstances and did not violate Mr. Arnold's Fourth Amendments rights.

## 2. Did Plaintiff's Conduct Violate a "Clearly Established" Right?

For a constitutional right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Supreme Court has stated that "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004).

In this case, even if Officer Hall's actions were objectively unreasonable, the Court cannot say that his use of force fell outside the "'hazy border' between excessive and acceptable force." *Id.* at 198. Indeed, in *Brosseau*, the Supreme Court has noted the absence of clearly established law governing situations where officers confront suspects in vehicular flight. There, the defendant-officer shot plaintiff after he ignored commands to exit his vehicle and began fleeing towards officers the defendant believed were in the immediate area. *Id.* at 196–97. The Court determined that, regardless of the constitutional question, the defendant was entitled to qualified immunity because the case law "by no means 'clearly establish[es]' that [defendant's] conduct violated the Fourth Amendment." *Id.* at 201.

In this case, the Court has determined that Officer Hall did not violate Mr. Arnold's Fourth Amendment rights.  Even if the question were debatable, Officer Hall's conduct— shooting a suspect whose vehicular flight immediately threatened officers—would fall precisely in the "hazy border" that the doctrine of qualified immunity is meant to protect.  Thus, Officer Hall is entitled to qualified immunity.

### C.   Assault and Battery

Mr. Arnold's claims for assault and battery necessarily fail because Officer Hall's use of force was lawful.  RCW 9A.16.020(1); *McKinney v. City of Tukwila*, 103 Wn. App. 391, 408–09, 13 P.3d 631 (2000) (where officers' use of force is reasonable, they are entitled to state law qualified immunity).

### D.   Intentional Infliction of Emotional Distress

Mr. Arnold's claim for intentional infliction of emotional distress likewise fails.  To state a claim for intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress."  *Snyder v. Med. Serv. Corp. of Eastern Wash.*, 145 Wn.2d 233, 242, 35 P.3d 1158 (2001) (citing *Birklid v. Boeing Co.,* 127 Wn.2d 853, 867, 904 P.2d 278 (1995)).  Moreover, "the conduct in question must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* (internal punctuation and emphasis removed).

Here, Officer Hall's use of force cannot be simultaneously reasonable *and* outrageous, and thus, the claim must fail.  Furthermore, Mr. Arnold has failed to produce any evidence of emotional distress resulting from Officer Hall's conduct.

//

//

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment [Dkt. #33] on all claims and orders the Clerk to **DISMISS** the case with prejudice.

Dated this 11th day of January, 2012.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE